UNITED STATES OF AMERICA
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ANGEL SOSA | No. 21 CR 718<br><br>Honorable Martha M. Pacold |

**GOVERNMENT'S SENTENCING MEMORANDUM**

On the evening of June 8, 2021, the defendant—a convicted felon—prowled the area of North Noble Street and West Walton Street carrying a loaded firearm with an extended magazine. That, alone, was a serious crime and worthy of a significant punishment. But defendant did not merely *possess* the firearm in a residential neighborhood. Instead, defendant fired his gun at Victim A not once, not twice, but 13 times. And defendant was not alone. Alongside defendant was his 17-year-old friend who *also* fired six shots at Victim A. Victim A suffered life-threatening and permanent injuries but thankfully survived. Although defendant admits that he possessed a firearm on June 8, 2021, he maintains that he fired his gun in self-defense. Not so. The overwhelming evidence—in fact, the *only* evidence—in this case proves that defendant attempted to murder Victim A. Because of the seriousness of his conduct and because of his personal history and characteristics, a term of imprisonment of 120 months, the statutory maximum, is warranted. The sentence is appropriate to provide just punishment for the offense, to promote respect for the law, to protect the public from further crimes of defendant, and to specifically deter

defendant from engaging in what has now become a pattern of serious, violent conduct.

## I. BACKGROUND

On November 22, 2021, defendant was charged by indictment with felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Dkt. 1. On December 19, 2023, defendant filed a motion to dismiss the indictment on Second Amendment grounds pursuant to the Supreme Court ruling in *N.Y. State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Dkt. 55. On July 16, 2024, defendant filed a supplement to his motion to dismiss. Dkt. 96, 97. On March 19, 2024, the Court denied defendant's motion to dismiss. Dkt. 65. Defendant then filed a motion to reconsider the denial of his motion to dismiss (dkt. 69), which the Court denied on August 13, 2024. Dkt. 76, 77. On April 9, 2025, defendant entered a blind plea to the charge in the indictment, and the Court set a sentencing hearing for July 10, 2025. Dkt. 89. The sentencing hearing was reset to August 22, 2025. Dkt. 92.

## II. OFFENSE CONDUCT

On the evening of June 8, 2021, starting no later than 9:15 p.m., defendant and a 17-year-old male ("Individual A") were present in or around the vicinity of North Noble Street and West Walton Street in Chicago, Illinois. When defendant and Individual A arrived in the area that night, they were each carrying a loaded pistol. Specifically, defendant was carrying a loaded Beretta, Model 92G, 9mm semiautomatic pistol bearing serial number BER408608Z, with an extended magazine capable of holding 30 live rounds of ammunition (the "firearm"). At the time he possessed the firearm, defendant was aware he was prohibited from

2

possessing a gun because he was a felon. In fact, on the night in question, defendant was *on parole* following a conviction in the Circuit Court of Cook County for unlawful possession of a firearm by a felon. PSR ¶ 60.

That same evening, CPD officers responded to the area of North Noble Street and West Walton Street in Chicago after receiving several 911 calls reporting shots fired in the area. *See* GVO Ex. A (CPD Supp. Report) at 8. When officers arrived at the scene, they discovered that Victim A had been shot several times. Victim A was transported to Stroger Hospital, and, according to doctors who tended to him, Victim A suffered two gunshot wounds to his lower right leg, two gunshot wounds to his left knee, and a gunshot wound to his right eye. *Id.* Doctors also informed law enforcement that Victim A suffered a broken left femur. *Id.*

Officers who arrived at Noble and Walton on the evening of June 8, 2021, also encountered defendant and Individual A, both of whom matched the description provided to law enforcement of the shooters in the area that evening. *Id.* The officers who encountered defendant and Individual A stopped their vehicle to question the suspects, but the suspects fled before officers had the opportunity to approach them. *Id.* While fleeing from police, defendant attempted to ditch his firearm by throwing it under a parked car. After an officer caught and arrested defendant, the officer returned to the area where the firearm—a Beretta, model 92G, 9mm semiautomatic pistol—was thrown and retrieved it from under a parked car.

Officers on the scene continued to canvass the area where the shooting occurred for evidence, and they collected 13 fired cartridge cases from the scene. *Id.*

3

at 14-15. Several of the 13 recovered fired cartridge cases had different headstamps, but all 13 cartridge cases were 9mm caliber. *Id.* at 15. According to examinations performed by the CPD Laboratory, all 13 recovered fired cartridge cases were fired from the same gun—defendant's Beretta, model 92G, 9mm semiautomatic pistol. GVO Ex. B (CPD Lab Report) at 1-2. Additionally, the CPD Laboratory also determined that the firearm possessed by Individual A also fired six shots. *Id.* at 1. However, because the firearm possessed by Individual A was a revolver, the fired cartridge cases all remained in the chamber. No other fired cartridge cases were recovered from the scene.

Aside from ballistic evidence and information provided by eyewitnesses, the fact that defendant fired several gunshots on the night in question is further corroborated by forensic tests performed on defendant shortly after he was arrested. Specifically, examiners determined that gunshot residue ("GSR") was detected on defendant's right hand, which led examinders to conclude that defendant "discharged a firearm" or had the right hand in the environment of a discharged firearm. GVO Ex. C (GSR Report) at 5-6.

Finally, defendant acknowledged during his blind plea that the firearm was manufactured outside the state of Illinois, and therefore traveled in interstate commerce prior to his possession of the firearm. PSR ¶ 11.

### III. GUIDELINES CALCULATIONS

The government respectfully disagrees with Probation's calculation of the applicable Guidelines.

The government agrees that the base offense level is 22 pursuant to Guidelines § 2K2.1(a)(3) because the defendant possessed a semiautomatic firearm capable of accepting a large capacity magazine and because defendant committed the instant offense subsequent to sustaining a felony conviction for a crime of violence, namely aggravated robbery. PSR ¶ 42. However, it is the government's position that the proper enhancements were not applied by Probation.

For example, Probation declined to apply a two-level enhancement for use of a minor during the commission of the offense, pursuant to Guidelines § 3B1.4, because Probation "has no evidence that the defendant directed Individual A to possess the weapon or shoot Victim A." *Id.* ¶ 45. But that is not the standard. According to the Seventh Circuit, "a defendant 'who *partners* with a minor will be found to have used that minor to commit his crime in the sense contemplated by Section 3B1.4.'" *United States v. Lovies*, 16 F.4th 493, 505 (7th Cir. 2021) (quoting *United States v. Ramsey*, 237 F.3d 853, 859 (7th Cir. 2001)) (emphasis added). In *Lovies*, the Seventh Circuit held that § 3B1.4 "does *not* require a defendant provide any specific direction to the minor to encourage the minor's participation in the offense," and that "voluntary participation" by the minor "does not negate evidence of a partnership" between the defendant and the minor. *Id.* (emphasis added).

Here, there can be no doubt, whether voluntary or not, that Individual A participated in the offense with defendant. To reiterate, witnesses who called 9-1-1 to report shots fired on the evening in question reported seeing two individuals (fitting the description of defendant and Individual A) firing shots. And when officers

arrived, they observed defendant and Individual A attempting to leave the scene together. Indeed, defendant, in his version of offense, *admitted* that he traveled to the area in question with Individual A in tow. *See*, PSR at 69-70. Finally, when Individual A was finally captured after fleeing from law enforcement, law enforcement officers determined that Individual A, like defendant, fired his gun several times. The government has proven, by a preponderance of the evidence, that Individual A, a minor, participated in the offense with defendant. Accordingly, a two-level enhancement applies pursuant to Guidelines § 3B1.4.

Additionally, the government has presented sufficient evidence to prove, by a preponderance, that defendant used the firearm in connection with the commission of another felony offense, namely, attempted murder, in violation of 720 ILCS 5/8-4. In rejecting the government's argument for this enhancement, Probation stated that it "has no information that the defendant went to the area where the shooting occurred with the intent to kill Victim A." PSR ¶ 39. Additionally, Probation noted that that "the government has not provided any evidence that the defendant knew Victim A before the night of the shooting, targeted Victim A, or intended to kill Victim A." *Id.* However, pursuant to the statute in question, the government is not required to prove that defendant traveled to the area in question with the intent to kill Victim A. That is not an element of the offense. Nor is the government required to prove that defendant knew Victim A or targeted him, specifically, before arriving in the area and shooting at Victim A. Illinois defines first-degree murder as follows:

6

First degree murder; death penalties; exceptions; separate hearings; proof; findings; appellate procedures; reversals.

> (a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
> > (1) he or she either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
> >
> > (2) he or she knows that such acts create a strong probability of death or great bodily harm to that individual or another

720 ILCS § 5/9-1.

Additionally, Illinois law defines "attempt" as follows: "A person commits the offense of attempt when, with intent to commit a specific offense, he or she does any act that constitutes a substantial step toward the commission of that offense." 720 ILCS § 5/8-4. Here, the physical and forensic evidence—including ballistic evidence and gunshot residue on defendant's hands—proves that defendant fired at least 13 shots from his gun. At the very least, defendant was aware that his acts (13 fired shots in a residential neighborhood) created a "strong probability of death or great bodily harm." And each shot that defendant fired was an "act that constitute[d] a substantial step toward the commission of [the] offense" of first-degree murder.

The government has also proven the requisite intent to support the enhancement and cross-reference. It is true that the "offense of attempt[ed] murder requires a specific intent to kill." *Singleton v. Butler*, 2016 WL 464215 at *3 (N.D. Ill. Feb. 8, 2016). In *People v. Mitchell*, 568 N.E.2d 292 (Ill. App. Ct. 1991), the Illinois Appellate Court discussed the requisite intent to commit attempted murder and

7

stated that "[i]ntent is a state of mind which, if not admitted, can be established by proof of surrounding circumstances, including the character of the assault, the use of a deadly weapon and other matters of which an intent to kill may be inferred." *Id.* at 569. "The very fact of firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill." *Id.* (citing *People v. Thorns*, 379 N.E.2d 641 (Ill. App. Ct. 1978)).

Here, the government has proven—and Probation has found—that defendant fired his gun at Victim A. PSR ¶ 43. There is no dispute about that.[1] And the fact that defendant fired his gun *13 times* is further proof that defendant did indeed intend to kill Victim A. So, too, is the fact that Individual A also fired his gun six times. *Id.* ¶ 8. Put simply, an individual does not fire his gun 13 times unless he intends to shoot and kill his target.[2] Moreover, the fact that law enforcement could not match any of the bullets lodged in Victim A's body to defendant's gun is immaterial. As noted above, defendant acted with the specific intent to "kill or do great bodily harm" to Victim A, and he committed an act that constituted a substantial step toward the commission of the offense, *i.e.*, he fired 13 separate shots.

Moreover, probation correctly noted that there is an absence of evidence that defendant, in firing 13 shots in a residential neighborhood, acted in self-defense. *Id.* ¶ 40. To the extent that the government bears the burden in rebutting defendant's

---

[1] As discussed further, below, defendant maintains that he fired his gun at Victim A in self-defense.

[2] The firearm in question was examined by law enforcement, and it did not have a Glock Conversion Device, commonly known as "switch," attached. In other words, in order to fire 13 bullets, defendant necessarily had to squeeze the trigger 13 separate times.

8

self-defense claim, it has done so, here. "Self-defense is an affirmative defense, and once it is raised, the [government] has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the elements of the charged offense." *People v. Gray*, 91 N.E.3d 876, 889 (Ill. 2017). Of course, the standard of proof for factual findings under the Sentencing Guidelines is preponderance of the evidence, not beyond a reasonable doubt. *United States v. Ofcky*, 237 F.3d 904, 908 (7th Cir. 2001).

In any event, self-defense includes the following elements: (1) unlawful force threatened against a person, (2) the person threatened was not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed that required the use of the force applied, and (6) the beliefs of the person threatened were objectively reasonable. 720 ILCS 5/7-1 (West 2010); *Gray*, 91 N.E.3d at 889. Applying the framework for sentencing, if the government negates any *one* of these elements by a preponderance, the defendant's claim of self-defense necessarily fails. *Id*.

The defendant traveled to the area in question armed with gun with an extended magazine, knowing he was not allowed to even possess it. *Id.* There is no forensic or eyewitness evidence to suggest that Victim A possessed, let alone fired, a gun at defendant and Individual A or that Victim A was somehow the aggressor in the confrontation. In support of his argument for self-defense, defendant points to information provided by a resident of the area who claimed that he heard three gunshots, came out of his house, and saw a man and woman outside a blue house

9

arguing. *Id.* ¶ 20. The resident then heard several more gunshots and ran inside. *Id.* But this, in no way, supports defendant's argument. The resident in question did not see the man—presumably Victim A—possess a gun. The resident did not see Victim A fire a gun. The logical leap from a witness seeing "man and a woman arguing in front of a house" to that man firing a gun at defendant is simply unsupported by the record and should be rejected by the Court.

What the record *does* reflect is that at least one witness saw two shooters—not three—who matched the description of defendant and Individual A. PSR at 16 (witness "related she did see the two offenders that were arrested with the guns" after hearing approximately 11 gunshots on the evening in question and "saw the two offenders looking frantic, talking on the phone before they were arrested."). There were two shooters on the night in question: defendant and Individual A. Accordingly, defendant's self-defense claim fails, and the attempted murder cross-reference applies.[3] As a result, the total offense level, with acceptance, is 39.

The PSR correctly calculated defendant's criminal history points as totaling six, which results in a criminal history category of III. PSR ¶ 62. Therefore, the

---

[3] Defendant also makes much of the fact that a police report listed defendant as being affiliated with the Maniac Latin Disciples street gang, the same gang affiliation as Victim A, to suggest that defendant would not shoot at a member of his own gang. PSR at 78. First, this proves nothing: defendant would be far from the first person to engage in intra-gang violence. It is also logically inconsistent—if defendant would not shoot a member of the same gang, then why would he have to defend himself from being shot at by a member of his gang? Second, when defendant was arrested in 2018 for unlawfully possessing a firearm, he told law enforcement that he possessed the gun (which he falsely claimed was a "bb gun") "for protection from the maniacs [Maniac Latin Disciples] because they always [messed] with [him], and that he use[d] the gun to scare them when they try to jump him." PSR ¶ 60. That defendant would shoot a Maniac Latin Disciple shortly after being released from prison is wholly unsurprising.

applicable Guidelines range is 324 to 405 months' imprisonment. Pursuant to Guideline §5G1.1(a), where the statutorily authorized maximum sentence is less than the minimum of the applicable Guideline range, the statutorily-authorized maximum sentence shall be the Guideline sentence. In this case, therefore, the Guidelines sentence is 120 months' imprisonment, in addition to any supervised release and fine the Court may impose.

### IV. THE § 3553 FACTORS SUPPORT A SENTENCE OF 120 MONTHS' IMPRISONMENT

Criminal sentencing has four purposes – retribution, deterrence, incapacitation, and rehabilitation. *United States v. Milbourn*, 600 F.3d 808, 812 (7th Cir. 2010). Section 3553(a) requires the court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing. In order to determine the particular sentence to impose, the Court must consider the familiar statutory factors listed in § 3553(a)(1)-(7). One of those factors is the advisory range set by the Sentencing Guidelines, and another is the Commission's policy statements. *See* § 3553(a)(4), (a)(5). Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 522 U.S. 38, 128 S. Ct. 586, 596 (2007). For two reasons, this Court should give serious consideration to the advisory Guidelines range.

*First*, the Sentencing Guidelines are the sole factor in § 3553(a) that provides any objective sentencing range that can practicably promote the overall goal of minimizing unwarranted sentencing disparities, which is itself a statutorily-

11

mandated factor, § 3553(a)(6). *See United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) ("The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country."); *see also Booker v. United States*, 543 U.S. 220, 250 (2005) ("Congress' basic statutory goal – a system that diminishes sentencing disparity"); *id.* at 253 ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity"); *id.* at 267 (rejecting other remedial alternatives because they were inconsistent with the "basic objective of promoting uniformity in sentencing"). The Supreme Court created the advisory system to "continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individual sentences where necessary." *Booker*, 543 U.S. at 264-65. The only way to prevent widespread unwarranted disparities is to give serious weight to the Guidelines.

*Second*, the Guidelines deserve meaningful consideration because they are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 128 S. Ct. at 594. It is true that there is no "presumption" that a Guidelines sentence is the "correct" sentence, *Rita v. United States*, 551 U.S. 338, 351 (2007), and that there is "broad" sentencing discretion post-*Booker*. *United States v. Demaree*, 459 F.3d 791, 794-95 (7th Cir. 2006). However, the Commission is "a respected public body with access to the best knowledge and practices of penology; its judgments should not lightly be disregarded." *United States v. Wachowiak*, 496 F.3d 744, 753 (7th Cir. 2007) (internal

12

quotation and citation omitted). Furthermore, the Commission is charged by statute to periodically review and revise the Guidelines as the Commission collects comments and data from numerous sources in the criminal justice system. *See* 28 U.S.C. § 994(o). These ongoing efforts to refine the Guidelines are another reason seriously to consider the advisory range.

The government understands that a maximum penalty sentence, even if within the Guidelines, is reserved for the most severe of cases. This is such a case. Here, a careful consideration of the § 3553(a) factors weigh in favor of a 120-month sentence.

### A. The Seriousness of the Offense and the History and Characteristics of the Defendant

The nature and circumstances of defendant's offense conduct is incredibly serious. This is not a run-of-the-mill felon-in-possession case where an individual is stopped on the street or in a car and is found to be possession of a firearm. Rather, this is a case where a victim—Victim A—was actually shot, severely injured, and permanently disfigured because of defendant's unlawful conduct. It is a minor miracle that not only that Victim A survived, but that no one else was injured or killed that evening. The forensic evidence in this case established that no fewer than 13 (but likely closer to 19, when factoring in shots fired by Individual A) gunshots were fired in the middle of a residential neighborhood in the early evening hours on a summer day. Defendant and Individual A clearly demonstrated that they had no regard for human life when they openly, and repeatedly, fired shots at Victim A. And defendant's knack for violence well predated the incident in question.

13

For example, and as noted in the PSR, defendant was on parole on the night in question following a November 2018 felon-in-possession conviction in state court. PSR ¶ 60. The November 2018 conviction actually bears significant and unmistakable similarities to the case at hand. There, officers saw defendant walking while holding his left side jacket pocket, which appeared to a contain a large, heavy object. *Id.* When officers attempted to approach defendant, he fled. *Id.* While he fled, defendant tossed his firearm, which was ultimately recovered by law enforcement. *Id.* Defendant was charged and convicted of felon-in-possession and was sentenced to five years' imprisonment. *Id.* Once defendant was released, he violated the terms of his probation and then violated them again when he was arrested in this case. *Id.*

Additionally, and tellingly, defendant committed the November 2018 offense while he was on parole following a March 2016 conviction. *Id.* ¶ 59. In March 2016, defendant was convicted of aggravated robbery with a firearm. *Id.* There, defendant and two co-offenders approached a victim on a sidewalk, displayed handguns, and robbed the victim at gunpoint before fleeing. *Id.* Although defendant was originally sentenced to just two years' probation, his misconduct while on probation resulted in a termination of probation and earned him a term of imprisonment of four-and-a-half years. *Id.*

And while defendant's violence and misconduct predated the charged offense, it persisted even after defendant was charged and detained in this case. Specifically, on March 10, 2025, while he was detained at the MCC, defendant was involved in a

14

confrontation with guards that resulted in defendant threatening the life of one of the guards ("Officer A"). GVO Ex. D (MCC Report)[4] at 1. Defendant's threats were specific, serious, and chilling:

> Hey [Officer A] . . . Boy, all this. Death wish. [Officer A], you gotta come out that parking lot. Boy, it's my back yard. It's my back yard, bitch ass n****r. [Officer A], you're on the list . . . I'm locked up for shooting someone in the face. Tell [Officer A] that. For real. Google me.[5] Shit's real. I'm fittin' to be [inaudible] soon. That's the killer part. That's the crazy part. He gotta come out that parking lot. You're in my back yard, boy. This building can't protect you forever, boy. I don't know from what area code you from. You gotta come out that parking lot, boy. I really want you to remember that. Remember my face. It's gonna be the face that **stands over you and puts real bullets in your body**. Real bullets. Real ones . . . Hey [Officer A] you a dead man bro . . . Man ***I'm gonna kill*** [Officer A] boy.

*Id.* (emphasis added).[6]

While the government has not charged the conduct outlined above, it is relevant for the purposes of 18 U.S.C. § 3553(a) and speaks directly to defendant's history, characteristics, and likeliness to recidivate.

Based on the seriousness of his conduct and based on his history and characteristics, a sentence of 120 months is sufficient, but not greater than necessary to account for the aims set forth in § 3553(a).

---

[4] Page 3 of the report is redacted pursuant to BOP policy.

[5] A Google search of Angel Sosa returns a news story published in June 2021: https://cwbchicago.com/2021/06/man-with-gun-near-noble-square-shooting-scene-is-on-parole-for-gun-offense-prosecutors-say.html (last visited June 27, 2025).

[6] The government intends to play the video at sentencing and can provide a copy to the Court beforehand if requested.

## B. The Need to Protect the Public and for General Deterrence

At only 27 years old, defendant has far from aged out of criminality. In fact, in the short time that he has been an adult, defendant has bounced from one conviction to another. Defendant needs to be incapacitated for a significant period of time to protect the community from further harm and danger. It is abundantly clear that prior sentences of imprisonment that defendant served in jail and in the custody of IDOC did absolutely nothing to deter him from the instant course of action. In fact, he engaged in almost identical conduct as his last conviction. Only this time, defendant nearly killed someone. Defendant's history and conduct in this case show that he will not be deterred from future criminal conduct by a below-Guidelines sentence—let alone a 64-month sentence—from this Court. Rather, this is the rare case where a statutory maximum sentence would be both a within-Guidelines sentence and sufficient but not greater than necessary in order to protect the public from defendant's disdain for, and inability to abide by, the rule of law. In addition, a 120-month sentence will promote respect for the law by sending a clear message that those who seek to unlawfully possess *and use* firearms will be held to account for their conduct.

## V. CONDITIONS OF SUPERVISED RELEASE

Supervised release is extremely important in this case. Defendant committed the instant offense while on parole. Defendant committed the *last* offense while on parole. The government agrees with all of the mandatory and discretionary and special conditions of supervised release recommended by Probation. All of these conditions should be imposed on the basis that they will facilitate supervision by the

16

probation officer, promote defendant's respect for the law, and deter him from committing future crimes. Lastly, the conditions will support defendant's rehabilitation and reintegration into the community, ensure that he is engaged in lawful pursuits upon release from prison, in light of defendant's history and characteristics.

## VI. CONCLUSION

Based on the foregoing, the government respectfully requests that this Court sentence defendant within the applicable Guidelines range of 120 months' imprisonment and 3 years of supervised release.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By:  s/ *Jimmy L. Arce*
     JIMMY L. ARCE
     Assistant United States Attorney
     219 South Dearborn Street
     Chicago, IL 60604
     (312) 353-8449
     jimmy.arce@usdoj.gov

Dated: June 27, 2025